IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| NORMAN L. WOERNER, | ) | |
| Debtor | ) | |
| VISION BANK, | ) | |
| Appellant, | ) | |
| v. | ) | CIVIL ACTION NO. 11-0269-CB-C |
| NORMAN L. WOERNER, | ) | |
| Appellee. | ) | |

## OPINION and ORDER

This matter is before the Court on appeal from the decision of the Bankruptcy Court in an Adversary Proceeding. Vision Bank, the plaintiff in that proceeding, appeals the bankruptcy court's order declaring the debt of the appellee, Norman L. Woerner, to Vision Bank dischargeable in bankruptcy. For reasons discussed below, the bankruptcy court's order is affirmed.

**Background**

Norman Woerner filed a Chapter 7 bankruptcy petition on August 6, 2009. On November 20, 2009, Vision Bank instituted an adversary proceeding to determine the dischargeability of Woerner's debt to Vision Bank pursuant to 11 U.S.C. § 523(a)(2)(B). After an evidentiary hearing, the bankruptcy court held that the debt is dischargeable. This appeal followed.

The debt arises from a loan to Total Vision of the Gulf States ("Total Vision" or "the company") that was guaranteed by Woerner.  Total Vision's intended purpose was to install video boxes in hotel rooms and condominiums across the country to provide on-demand video and internet services.  In 2006, Woerner took steps to acquire a controlling interest in Total Vision.  To do so, Woerner invested $2 million of his own money and assumed Total Vision's debt, which was considerable.  But this was not enough to sustain the company.  It needed an additional $1.5 million to purchase new equipment for installation.  Vision Bank, which had previously loaned Total Vision $5 million,[1] agreed to fund the line of credit if Woerner and one of his companies,[2] Wood Treaters, LLC, would guarantee the loan.

Vision Bank's nondischargeability claim arises from Woerner's failure to disclose Wood Treaters' contingent liability on a loan, or series of loans, from AmSouth Bank to various Woerner-related entities.  Less than two months before Vision Bank issued its commitment letter on the Total Vision loan, Woerner and several of his limited liability companies, including Wood Treaters, entered into a Master Loan Agreement with AmSouth.  The Master Loan Agreement actually involved several loans.   The Wood Treaters' loan consisted of a $1 million term note, a line of credit up to $600,000 and a $400,000 equipment loan.  Several other Woerner companies received loans, up to $3.4 million in total.  AmSouth required Mr. Woerner and his wife, as well as all of the companies involved in the AmSouth loan, including Wood Treaters, to sign cross-guaranty agreements.  These cross-guaranty agreements made each entity contingently liable for

---

[1] This loan had been paid down to $4.2 million.

[2] Woerner had an interest in numerous business enterprises, hereinafter collectively referred to as "the Woerner entities" or "the Woerner companies".

2

the debt of the others.  Consequently, Wood Treaters had up to $2 million in direct liability to AmSouth plus up to $3.4 million in contingent liability to AmSouth.[3]

In connection with the Total Vision loan, Woerner and Ray McCraine, CFO of Woerner Management, provided Vision Bank with numerous documents related to Woerner's business and personal finances.  None of these documents disclosed Wood Treaters' contingent liability to AmSouth.  Prior to closing, Vision Bank discovered several UCC-1 filings by AmSouth reflecting liens on Wood Treaters' assets.  These UCC-1's had not been provided by Woerner.  However, McCraine did provide Vision Bank with unsigned copies of the AmSouth/Wood Treaters loans, which apparently reflected only Wood Treaters' direct liabilities, i.e., the $1 million promissory note, the $600,000 line of credit and the $400,000 equipment loan.  Vision Bank never asked for signed copies of those loan agreements, nor did it ask for all documents from the AmSouth loan.  Woerner and McCraine also provided unaudited internal financial reports to Vision Bank.  These included monthly internal balance sheets and profit/loss statement for each company.  These internal financials contained no footnotes.  Pursuant to accepted accounting practices, contingent liabilities are disclosed in footnotes.  The Woerner companies' audited year-end financial statements, which Woerner were provided to Vision Bank, contained footnotes disclosing contingent liabilities.

Based on the information before it, Vision Bank concluded that Wood Treaters had sufficient cash flow to serve as a secondary source of repayment if the primary source (the sale of equipment purchased by Total Vision) was insufficient.  Vision Bank considered Wood Treaters' guaranty to be an integral part of the loan.  At the time it entered into the $1.5 million

---

[3] Prior to consolidating its loans with AmSouth, the Woerner entities had shopped around with several banks, including Vision Bank.  Vision Bank knew about the search because it had been one of the banks in contention for the loan.

loan to Total Vision, Vision Bank knew that Wood Treaters was directly liable for up to $2 million but did not know that Wood Treaters was contingently liable for up to an additional $3.4 million.

The Bankruptcy Court held that Vision Bank failed to prove by a preponderance of the evidence two of the five requirements necessary for nondischargeability under 11 U.S.C. § 523(a)(2)(B)--reasonable reliance and intent to deceive. The court found that Vision Bank did not reasonably rely on the Woerner's untrue statements about Wood Treaters' financial condition because "red flags" in the information Woerner provided should have alerted the bank to investigate further. Regarding the final requirement, the bankruptcy court found that Woerner acted with neither intent to deceive nor reckless disregard. Woerner "instructed his Chief Financial Officer to give the Bank all of the documentation it needed. . . and disclosed all his debts." R. at 133. Woerner was unfamiliar with the accounting practice for guaranty obligations and "honestly believed that cross-guarantees were different from cross-collateralizations and misunderstood the way cross-guarantees needed to be listed on a financial statement." *Id.*

## Discussion

Vision Bank appeals the bankruptcy court's decision that Woerner's debt to it was dischargeable. A central purpose of the bankruptcy code is to provide the "honest but unfortunate debtor" with a fresh start. *In re Miller*, 39 F.3d 301, 304 (11th Cir. 1994). Not all categories of debt are equal, however, and in 11 U.S.C. § 523 Congress excepted certain types of debts from discharge. *Grogan v. Garner*, 498 U.S. 279 (1991). One of those is the fraud exception found in § 523(a)(2)(B).

> Under 11 U.S.C. § 523(a)(2)(B), a debt is non-dischargeable in bankruptcy where it was obtained by a writing: (1) that is materially false; (2) respecting the debtor's or an insider's financial condition; (3) on which the creditor to whom the

>    debt is liable for such money, property, services, or credit reasonably relied; and
>    (4) that the debtor caused to be made or published with the intent to deceive.

*Miller*, 39 F.3d at 304. Because bankruptcy exceptions are narrowly construed, the burden is on the creditor to prove each of foregoing elements by a preponderance of the evidence. *Id.* If the creditor fails to meet his burden as to any one of these elements, the debt is dischargeable. *Id.* As noted above, the bankruptcy court found Vision Bank's proof fell short on the two latter elements—reasonable reliance and intent to deceive. This Court's review is confined to those two elements.

### *Standard of Review*

Before addressing these issues, the Court must determine the appropriate standard of review. In a bankruptcy appeal, the district court functions as an appellate court. *In re Sublett*, 895 F.2d 1381, 1383 (11th Cir. 1990). This Court reviews the bankruptcy court's decision on matters of law *de novo*, giving "[no] deference to that court's analysis and conclusions." *Id.* Findings of fact will not be reversed unless clearly erroneous, and [t]he bankruptcy court's findings of fact are not clearly erroneous unless, in light of all the evidence, [this court is] left with the definite and firm conviction that a mistake has been made." *In re Internat'l Pharm. & Discount II, Inc.*, 443 F.3d 767, 770 (11th Cir. 2005). Vision Bank concedes that "intent to deceive" is a factual finding subject to review under the "clearly erroneous" standard. *See Miller*, 39 F.3d at 305. Without any citation to authority, Vision Bank argues that the bankruptcy court's "reasonable reliance" finding is a mixed question of law and fact subject to *de novo* review. The Eleventh Circuit reached the opposite conclusion in *In re Collins*, 946 F.2d 815,

817 (11th Cir. 1991), holding that "[t]he bankruptcy court's finding [of reasonable reliance]. . . was a finding of fact" due to be upheld unless "it is clearly erroneous."[4]

### *Reasonable Reliance*

The Fifth Circuit succinctly defined the reasonable reliance element as follows:

> The reasonableness of a creditor's reliance, in our view, should be judged in light of the totality of the circumstances. The bankruptcy court may consider, among other things: whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*In re Coston*, 991 F.2d 257, 261 (5th Cir. 1993) (en banc) (per curiam).

Applying this standard the bankruptcy court identified "red flags" that would have caused a reasonably prudent banker to request more information.  First, Vision Bank knew that "Wood Treaters and other Woerner Entities were negotiating a new consolidated banking arrangement with AmSouth" and that "[t]he AmSouth loan and UCC filings were very recent." Based on this information, the court found that "a 'reasonably prudent banker' would have asked to see all of the signed documents involved in the AmSouth loan and specifically asked to see the details behind the UCC filings." R. at 131.  Second, Vision Bank had in its possession prior years' audited financials from Woerner Enterprises in which contingent liabilities were set forth in footnotes.  Vision Bank also had more recent unaudited internal financials from the Woerner entities which lacked any footnotes.  In the bankruptcy court's determination, "[a] reasonably

---

[4] Indeed, the clear weight of authority supports application of the "clearly erroneous" standard.  *See In re Kosinski* 424 B.R. 599 (BAP 1st Cir. 2010); *In re Cribbs*, 327 B.R. 668 (BAP 10th Cir. 2005); *First Nat'l Bank of Olathe, Kansas v. Powtow*, 111 F.3d 604 (8th Cir. 1997); *In re Plechaty*, 213 B.R. 119 (BAP 6th Cir. 1997); *In re Cohn*, 54 F.3d 1108 (3d Cir. 1995); *In re Coston*, 991 F.3d 257 (5th Cir. 1993); *In re Siriani*, 967 F.2d 302 (9th Cir. 1992); *see also In re Rovell*, 194 F.3d 867 (7th Cir. 1999) (finding reasonable reliance to be mixed question of law and fact but subject to clearly erroneous standard).

prudent banker would have inquired about what any footnotes would reveal or asked for financials prepared by [an auditor]."

Vision Bank argues that the bankruptcy court's decision on this issue is due to be reversed because that court held it to an unreasonably high standard that would require it to (1) investigate a Debtor's private financial documents with unrelated lenders, (2) obtain reviewed year-end financial statements for 2006 that were not available and (3) to disregard written financial statements by the lender.  Contrary to Vision Bank's argument, the bankruptcy court applied the correct legal standard, and its reasonable reliance determination is not clearly erroneous.  The court did not impose an unreasonably high standard simply because *in this particular case* the court found that a reasonably prudent banker *with the knowledge Vision Bank had* would have acted differently.  Vision Bank knew that the Woerner entities had recently consolidated loans and its new lender had filed UCC-1's.[5]  For that reason, the court held that Vision Bank should have required the debtor to provide documentation from another lender.  Furthermore, the bankruptcy court's finding did not require Vision Bank to obtain nonexistent financial statements.  Rather, the court pointed to the contrast between the audited financial statements from prior years and the more recent unaudited monthly reports, both of which were in Vision Bank's possession.  The former had footnotes; the latter did not.  Since contingent liabilities were disclosed in the footnotes, the lack of footnotes in the latter would have caused a reasonably prudent banker to inquire whether there were undisclosed contingent liabilities.  Finally, Vision Bank argues that the documents presented to it by Woerner were all consistent

---

[5] Initially, the bankruptcy court found that Woerner had provided the UCC-1's to Vision Bank.  The court subsequently corrected its order and found that Vision Bank had discovered the UCC-1's through its own efforts.

and did not raise any red flags. That argument ignores the bankruptcy court's findings that some of the documents presented, i.e., the financial reports, contained red flags.[6]

Vision Bank relies heavily on *In re Davenport*, 2011 WL 2533087 (Bankr. M.D. Ala. June 24, 2011), to demonstrate that the bankruptcy court's reasonable reliance determination in this case was in error. *Davenport* is not helpful, however, because the reasonable reliance issue is a factual determination that must be made on a case-by-case basis. *In re Gordon*, 277 B.R. 796, 803 (Bankr. M.D. Ga. 2001). That two judges decided different sets of facts differently does not leave this Court with the firm conviction that one of those judges erred. Furthermore, even if *Davenport* were a guidepost for the reasonable reliance standard, it does not help Vision Bank's cause. In that case the debtor was both a CPA and a lawyer (who had also worked a year toward an LL.M in tax law). He sat on the board of directors of several corporations. His credibility was enhanced by the fact that his family was also prominent in the local community. For these reasons, the *Davenport* court found that the bank reasonably relied on the debtor's eight financial statements which were submitted over the course of twelve years in support of a personal loan renewal. Those statements omitted the debtor's personal tax liability to the IRS, omitted at least two personal guaranties and omitted several creditors. The instant case involves one loan application with enough red flags to put Vision Bank on notice that some information was missing. Moreover, unlike Davenport, there was no particular reason for Vision Bank to place enhanced reliance on Woerner's education, training, experience, or credibility.

---

[6] Vision Bank contends that the UCC-1's were adequately explained by McCraine as tied $1.3 million in direct liability. The point is, as the bankruptcy court implicitly found, that it was not reasonable to rely on the oral representation of the borrower.

In conclusion, the bankruptcy court applied the correct legal standard in reaching its determination that Vision Bank did not reasonably rely on the written statements provided by Woerner. The court's factual finding on that issue is not clearly erroneous.

### *Intent to Deceive*

Intent to deceive may be inferred from the totality of the circumstances, "including the recklessness of a debtor's behavior." *In re Miller*, 39 F.3d at 305. "'Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inferrence [sic] of intent [to deceive].'" *Id.*(quoting *In re Albanese,* 96 B.R. 379, 380 (Bankr. M.D. Fla. 1989)). The bankruptcy court held that Woerner "neither intended to deceive Vision Bank nor acted with reckless disregard in his dealings with them." R. at 132. The court based its conclusion on the following facts:

> . . .[Woerner] instructed his Chief Financial Officer to give the Bank all of the documentation it needed. Woerner Disclosed all of his debts. He had never had to deal with the guarantee obligations on his financial statements before and was unfamiliar with the accounting for them. He honestly believed cross-guarantees were different from cross-collateralizations and misunderstood the way cross-guarantees needed to be listed on a financial statement. He trusted and relied upon his CFO to provide him with the documentation the Bank needed. Finally he had an attorney who represented him at the closing and looked over the documents and that contributed to his belief that every thing was disclosed appropriately. . . .
>
> The Court found Norman Woerner to be credible. He was wrong in his belief but the Court concludes he testified truthfully. The Court only had Ray McCraine's deposition to read and did not see him testify, but his testimony appeared to be truthful.

R. at 132-33.

Vision Bank argues that this conclusion is clearly erroneous for several reasons. First, it notes that Wood Treaters' contingent liabilities (i.e., the cross-guaranties) were omitted from a number of documents submitted in support of the loan. Next, it points out the amount of money involved in the undisclosed contingent liabilities--$3.4 million. Third, it argues that the non-

9

disclosure was particularly egregious because Woerner was "double pledging" collateral already pledged to AmSouth and failed to reveal this fact to AmSouth.  Finally, Vision Bank points to McCraine's educational background and Woerner's business acumen as evidence that they acted recklessly in failing to disclose the contingencies.  These arguments are not persuasive.  Even educated CFO's and savvy businessmen make mistakes, and none of the facts cited by Vision Bank convince this Court that the omission was anything other than the honest mistake the bankruptcy court found it to be.  That it occurred on a number of documents means only that the mistake was consistent.  The amount of money involved does not support a finding of recklessness.  This is a single misunderstanding about contingent liabilities arising from one Master Loan agreement which happened to involve a substantial sum of money.  Finally, Woerner's failure to disclose this transaction to AmSouth is immaterial for several reasons.  The record does not reveal any obligation Woerner might have had to disclose the details of his Vision Bank loan to AmSouth.  The AmSouth loan had already closed, and AmSouth had perfected its security interests by filing UCC-1's.  Even if an obligation to disclose existed, Woerner did not believe these were contingent liabilities and, therefore, did not realize he was "double pledging" assets.  In sum, the bankruptcy court finding regarding intent to deceive was not clearly erroneous.

**Conclusion**

This Court finds no error in the factual findings and legal conclusion of the bankruptcy court.  Therefore, the bankruptcy court's order declaring the debt dischargeable is **AFFIRMED**.

**DONE** and **ORDERED** this the 16th day of April, 2012.

*s/Charles R. Butler, Jr.*
**Senior United States District Judge**